May it please the Court. Good afternoon, Your Honors. I am Randall Kleinman, representing eQHealth and its appeal from a denial of coverage in a claims made and reported insurance policy. Under a claims made and reported policy, a claim must be reported in writing during the policy period in order to attribute coverage. In this case, coverage was provided for what the policy defined as managed care activity. My client is in the business of managed care. It administers Medicare, Medicaid, and other health care plans for public and private entities. Under the policy definition of managed care activity, there are two relevant provisions. The first one is provider selection, which encompasses a selection of any provider of medical services. Also included within the term is utilization review, which encompasses a process of evaluating the necessity, cost, or appropriateness of medical services for In this case, my client was the Florida . . . my client's client, I should say. My client's client was the Florida agency for health care administration. They're an additional insured. They could have filed the claim, but you didn't have authority to file a claim on their path. That is correct. Okay. And so really, the district court just narrowed this all down to the condition precedent that the policy required you to give Homeland a written demand against your client, EQ Health. And that happened. And that happened. But the district court said, not looking at these. No. The district court got it wrong on two bases. First, it found that there was no claim made against my client, where in point of fact, there were demand for services from Dr. Kathy Goldberg, who's my client's medical director, for the . . . to make arrangements for the transportation of the patient from Oklahoma to Florida, and to pay for the cost of the transportation. And I think of that as the Jones letter, because Goldberg . . . that was in writing. Yes. Okay. But help me out here, though. That wouldn't get you to the 262 reimbursement, right? That would just be for the payment for the transport and for the services. Admittedly, things covered if they exceed $50,000. But how would you get to the $262,000? Well, Your Honor, because once . . . because there are two claims here. There are related claims. Okay. This requires us to go with your now . . . the related claims. Right. A claim actually reported, or a claim that was just out there? Do you see the distinction? The . . . I guess, let me rephrase that. In one or two sentences, point me in the record to where there was a written demand of your client, or you may tell me this isn't relevant, but of your client for the full reimbursement value. Does that claim exist in writing? There was, back in December 12, 2020, when there was a so-called tender. So-called what? A tender. That's what Homeland calls it, a tender. In December 12 of 2019, I'm sorry, not 2020, 2019, my client submitted a tender. Oh, a tender. Right. But that was a notice. They acknowledge that was a notice of a likely claim. Well, when you get back to it, and you see that there are two claims made in that June 10 letter from the attorney for Brookhaven, you turn it into a single claim. Okay? Because that's what the policy says. They want to have everything under one single claim. And it all . . . it means . . . I'm just interrupting so I understand. You're saying that early notice that they may . . . you may be on the line for the Brookhaven care given to BNN. That early notice coupled with the latest notice that's focusing on BNN wanting to be reimbursed for the transport and the new provider, those together were a written demand. Is that your theory? And that's what the policy says. Okay, but is that your theory? Is that your theory? That's your theory of the case? It turns on there being related claims and the necessary and related one being the early notice. Is that correct? That relates back to the policy period. For some reason they use the term policy period to state where the claim began and when it is made, when a related claim is made. Okay? And they say the claim is deemed to have been made during the policy period. Well, the policy period begins in January of 2019. Yeah. And this single claim, this big loss is one of the cases I've cited to the court is involved. There's one big loss. And my client settled it. Settled it with Brookhaven under a settlement agreement that also included the agency. Brookhaven's claim against the agency. Just to be devil's advocate though, the person it didn't include was Homeland, right? Because that admission of liability where you say you're on the hook for a quarter million, that's in May of 2019. When did you first tell Homeland that you had admitted liability to the tune of a quarter million dollars? It was on December the 12th. So that's a problem under a separate issue, not the one the district court reached, is it? Well, actually, as I see it, Your Honor, what happened was on May 16, 2019. There was an admission of liability, but it was an inchoate admission of liability. It required Brookhaven to participate to agree. The agreement was between Brookhaven, between my client and the agency. I guess I'm a little skeptical in the policy 4C where it's talking about what you have to get their consent to do. It doesn't talk about inchoate versus not inchoate. It just says you can't admit liability. It doesn't say, well, you can admit it until they sign the document or it's legally binding or there's been payment. It just says talk to us before you admit liability, doesn't it? It says that, Your Honor, but we have to really parse the language of that. Okay. Because this is exactly what it says. You will not accept at your own cost, incur any expense, make any payment, admit any liability, assume any obligation, or settle any claim without our prior written consent, and no coverage will be available under this policy for any such settlement, expense, payment, liability, or obligation. It requires that a cost be incurred. And when was a cost incurred? It was incurred in August after Homeland had denied coverage on June 21st on a claim that is deemed to have been made and reported in January. Okay? Right, but even on that chronology, you're admitting liability before they deny the claim a month later. Well, that admission of liability could not be enforced. Say they went to court and said, you agree to pay? And my client would say, no, I don't have to pay. I don't have to do anything because Brookhaven has not consented. Okay? And until Brookhaven consents, it's a revocable admission of liability. That's why I call it NCOA. It's not enforceable. And it's until that happens. I took you a little afield because the district court's ruling was back to where's the written claim? Well, your standard of review allows you, of course, to know. No, no. But I don't believe that this admission of liability by itself, which was made on May 16th, necessarily covers that. And the evidence is overwhelming that it was conditioned and contingent upon Brookhaven's approval. In fact, that June 10 letter says basically we reject this proposal and we want full payment. The letter makes a claim against the agency. It's basically an ultimatum against the agency. It tells them, you do this, you pay, you get rid of this patient who's been in our hands for some time, pay us fully, or we'll sue you. If that's not a claim, I don't know what is. The judge said it was a disagreement between the agency and Brookhaven. A lot more than a disagreement. I mean, they were accused of fraud, all kinds of stuff. So it was also a claim against my client. And it was a related claim. It began, it turned into a single claim. And that's the way they want it. And they want it to relate back to January 16, the beginning of the policy period. That's fine with us. Because they denied coverage on June 21 on a claim that the policy, under the reasonable reading of the policy, was made and reported on January 16. That's how they wrote their policy. And the admission of liability really needs, that clause really needs to be parsed. Because the second part of the clause says that there is no coverage, no coverage will be available under this policy for any such settlement, expense, payment, liability, or obligation. It doesn't say admission of liability in there. They took that out. So I contend it's ambiguous. I mean, you admit liability on an inchoate claim, and then you say you're not going to provide coverage, but you don't mention admission of liability? Come on. That just doesn't, that's ambiguous in my estimation. So that, to me, essentially is the case. A conditional admission of liability that is by its nature revocable and which is not accompanied by non-consensual payment does not trigger its application. I just don't think that is correct. To make its intentions clear, Homeland could have said that there will be no coverage for admissions of liability which will ultimately result in a payment to which Homeland does not consent to in writing. Easy enough to put in that clause. They didn't do that. That clause is ambiguous. And that's, it's far from what it wrote. Now, I don't, I really think the district court got it wrong when it said there was no claim. to the obligations that Brookhaven demanded from my client and said it was a disagreement between the agency and Brookhaven. I don't, that was wrong. There were two claims in that June 10 letter. They are clear as day. And I just, and certain things flow out of that. Sorry. Certain things flow out of that. You're not saying the record conclusively shows that the transportation costs and the service costs to find a new provider would exceed $50,000, are you? Standing alone, the June 10 letter doesn't get you there. There's nothing in the record on that. Okay. But we have a single claim, and the claim against the agency is significant. It's $200,000 plus. Okay. So I think if they want to have a single claim, fine. That's fine with us. I mean, we, my client, they want to have a single claim for one simple reason. They want to keep everything within one policy limit. But in this case, it doesn't work the way they'd like it to work. In other cases where you've got multiple claimants and related claims, well, yeah, that might exceed the policy limit. Then, yeah, okay, fine. You have a situation where that benefits the insurer because it's got only one policy limit to deal with. But that was not the case here. They did not take that kind of circumstance which is presented in this case into account when they wrote that language. But they're relying on it, and in my estimation, they are relying on it improperly. They never even recognized in any of their correspondence that there was a related claim, although there was later some suggestion that they would pay the agency's legal fees, which suggested, okay, well, maybe somebody somewhere did know this was a related claim, and they needed to treat this differently. I see my time is up. But you have rebuttal time. Thank you for that argument. Ms. Emmerling? May it please the Court, Victoria Emmerling on behalf of Defendant Apelli Homeland Insurance Company of New York. As you've briefly heard, this case is about an underlying dispute between AHCA and Brookhaven Hospital over failure to pay provider agreements. The specific issue before this Court is whether, despite the lack of a written demand, an insured can make a unilateral business decision to admit liability and indemnify one of those parties in the underlying dispute without notice to or consent of Homeland, amongst other issues. The Court correctly found here that there's no coverage. Preliminarily, the burden is on EQ Health to show the initial grant of coverage, and that is that the coverage is triggered under the insuring agreement. The District Court preliminarily found that there was no claim, but there are multiple elements to the insuring agreement that must be shown. That's the condition precedent, and that's as far as the District Court got. In a footnote, it said you had these other arguments. Correct, Your Honor. That is correct. Your primary argument to affirm is that the District Court was correct, there wasn't a written claim? That's correct, Your Honor. Am I right, though, that the record is pretty conclusive, and you'll probably tell me this doesn't matter, that your client was aware throughout of the Brookhaven agency debate, in fact, the cost, and that the agency was going to seek indemnification? They were aware of it through multiple phone calls. You're just pointing out, but correct me if I'm wrong, that there wasn't something in writing saying EQ Health was on the line for $262,000? What Homeland was aware of was the potential for there to be a claim subsequently made by HCA to EQ Health for indemnity. That was originally what was reported on April 30, 2019, was, hey, we've got all this rumbling. There are potential errors and omissions that could give rise to a claim for indemnity against EQ Health. But at no point in time, specifically at the time the notice of circumstances happened, there was no allegation as to an amount or cost at all. And everything after that date is after EQ Health had already admitted liability and agreed to indemnify HCA without notice or consent of Homeland. Certainly, once the Jones letter came about, there was an indication that there was being a demand for payment of the provider agreements by Brookhaven HCA. But the collateral claim of whether HCA would seek that indemnity from EQ Health and on what basis was not known at that time. And that's why the June 21, 2019 letter from Homeland to EQ Health noted we're still dealing with a potential claim here because we haven't heard anything from HCA to EQ Health. So there wasn't a denial at that time. It was a continuation of a notice of circumstances. The first time we get any kind of report of an actualized claim from HCA to EQ Health is December of 2019 after all of the admissions of liability, the agreement to indemnify, and then, of course, the actual settlement with Brookhaven. But that's too late here for purposes of coverage. Nowhere was there ever a written demand to EQ Health that it pay the provider agreements, whether from Brookhaven or from HCA in the form of an indemnity request. And indeed, in the record, there is very clear evidence of EQ Health admitting that in response to written discovery that they never received an indemnification letter. The Brookhaven letter itself also does not seek payment of the provider agreements from EQ Health. Instead, as Your Honor pointed out, what the request was in that Brookhaven June 2019 letter was that Dr. Goldberg, if the services were readily available in Florida, that they find a place for the patient to be transported and pay the cost for that transport. But that is a request for services and money. So there's an issue with that. So first off, let's split it in half. The request to locate a facility for transport is a form of non-monetary relief, and that in and of itself is excluded from the definition of damages under the policy. If you then look at the cost element of it, it is not something EQ Health ever would have been responsible for paying. Nowhere are they obligated to pay for transport fees. They're also not obligated to find locations for services. All they do is review the utilization once the request comes in from a provider to provide care. So neither of those were within the legal ambit of the liability of EQ Health. But on top of that, once you get to the cost of transport, even if we assumed that EQ Health had a legal liability for that, there's no evidence of anything beyond the retention here, the $50,000 retention that you pointed out. And in fact, in the record, EQ Health admitted in response to discovery it incurred no such cost. So even that claim, if it could be considered a claim, is moot. That's not what EQ Health is seeking coverage for. Certainly there's no evidence that it got above the retention, which is required to trigger coverage in the first place. Beyond that, everything beyond the notice of circumstances also does not trigger coverage. We've gone over the Brookhaven letter. In addition to that, there's a series of e-mails exchanged that are referenced by EQ Health. They don't rise to the level of a claim. The policy doesn't require it being a single document. It could be multiple documents. And his point is, if you look at them all, they're related, and they sufficiently informed in writing that they were probably going to be on the hook, as they ultimately did end up on the hook. But I think that's a question. So part of the issue here is that at what point do you have enough to put an insurer on notice, and what is sufficient? So we're not dealing with a situation here where you have a complaint or a very clear, all-inclusive demand, which is usually what's given to an insurer to be able to make sure that all of their requirements are met to see that the initial grant of coverage is at least triggered. That's not what we have here. What we were dealing with in this situation is that there was originally a fair hearing on an appeal by the Florida patient, right? And some of those communications are related to that fair hearing and have nothing to do with the subsequent dispute over payment of the provider agreements once the continued stay authorization was denied and upheld. So I don't believe that all of those records are related to each other or deal with the same issues. Now, meanwhile, the record shows there were multiple phone calls informing you, Little Louisiana Company, we could be on the hook for this. That is correct, Your Honor. We just put that aside. Certainly, because it's not a written demand. I mean, at some point, the Fifth Circuit case law indicates that the intention and sort of expectations of the insurer are not determinative of whether there actually is a written demand for damages in a case. Just for example, in FDIC versus Mihalis, I think they said that the mere threat or the potential of something or the expectations of the insured are not sufficient. And the reason for that is because it would become impossible for an insurer to know whether the requirements of the policy are met simply by the insured saying, I think this may happen. But am I oversimplifying the policy? And you clearly know this area of law much better. You do allow the claim to be filed later, provided they put you on notice that it could happen. We're just all crossing our fingers they are not going to seek it. That's correct, Your Honor. So that's exactly right. This is a claims made and reported policy, and sometimes it can lead to harsh consequences where if you didn't have the claim made and it wasn't reported during the policy period, you're out of luck. It's not like an occurrence policy where the mere act during the policy period would trigger coverage. In order to lessen the harshness of that effect, the policy includes what's known as a notice of circumstances provision. And this allows the insured to report a circumstance sort of like an occurrence, but here it would be a wrongful act, error, or omission, and say I think this may give rise to a claim later. The mere fact then that the claim actualizes through a written demand after the policy period would not preclude coverage so long as the notice was given under that notice of circumstances provision. Here it's somewhat of a misnomer that we're dealing with this notice of circumstances and the timing because all of it occurred during the policy period. We're not dealing with an out of time situation. They just never to this day ever memorialized and actualized a written demand. That's correct. That's exactly correct, Your Honor. So to this day we have nothing in writing ever demanding indemnity from EQ Health, much less the basis for the same. And that's the real rub here. We don't have anyone ever submitting a demand to EQ Health to pay the provider agreements. So we understand the unilateral business decision that was made here, but that isn't sufficient in order to get coverage under the policy, and certainly not without the consent of Homeland. The agency was an additional insured. They could have filed the claim too. The agency was an additional insured, could have filed a claim, didn't file a claim. EQ Health admitted they didn't have authority to act on their behalf  So we don't have a situation where AHCA sought that additional insured coverage, said I'm getting this, can you please review coverage for that. But on top of that, the HCA claim in that framework would not have been covered. The payment of provider agreements is not a managed care activity. That's one of the requirements to trigger coverage from the insuring agreement. There's other parts of it. It's also not considered damages under the policy, and that's because the policy is not supposed to be covering your contractual obligations. It's supposed to be covering an act, error, or omission in your professional duties. But almost everything EQ Health did related to its contract with the Florida agency. So with that, I guess I was a little on either multiple lines that you say you don't owe coverage. One was the indemnity provision. The other was the contract provision. What were they getting from their coverage, if it excluded anything relating to or stemming from a contract? So if there was a different type of, as EQ Health pointed out in its reply brief, if there had been a true breach of contract situation that wasn't an indemnity claim, that potentially could be covered. Also, if Brookhaven had made an allegation against them that you erred in the performance of this managed care activity, that potentially could be covered. That's not an illusory grant of coverage within the policy. There are circumstances that could trigger it. It just didn't here. You heard me discuss with opposing counsel extensively the settlement predicament, and you heard his answers. Because that's an independent ground not reached by the district court. Correct, Your Honor. That's correct. I think you underheard him. How would you answer his remarks that what they did wasn't an admission of liability in May? I don't know how you get around the record evidence that clearly the CEO of the insured EQ Health says in writing, I admitted liability to AHCA. The admission of liability in and of itself is enough to fall within the framework of the voluntary acts provision. It delineates different acts that could potentially, if not done with the consent and notice of Homeland, void coverage or at least Homeland's obligation to cover it. The insured certainly could make those decisions to do those acts, and that's what it did here. But it then simultaneously can't bind Homeland to cover that admission of liability, for example. When does it reflect that they did ask for consent? In February, I mean in December of 2019. After the fact, after the actual admission, the agreement to indemnify and the settlement with Brookhaven is when they finally went and tendered the claim to Homeland and said, this has occurred, we would like coverage for it. So it was all after the fact. And that is a very clear, under the law, violation of the voluntary acts provision for which no coverage would be owed then. I understand that there was an argument about having assumption of liability and somehow that is different than liability that is referred to later in the same provision. But of course, that provision in and of itself refers to such liability, which is clearly in reference to the prior assumed liability portion of the clause. So I don't believe that there's any ambiguity in that provision. It's been upheld as very clear in other cases. And I'm not aware of any case law reading that ambiguity in there simply because they left out assumed in the latter part where it was referenced in the beginning. On top of that, it would somewhat lead to an absurd interpretation of that policy to say that it doesn't refer to assumed liability. Because in that situation, what other liability would there be that would violate that provision? You either have assumption of liability or you have adjudicated liability. And certainly adjudicated liability would never fall within the scope of the voluntary acts provision. So the only reasonable interpretation is to assume that liability on its own is sufficient. The agreement to indemnify AHCA is an obligation. That also is sufficient. So the mere fact that our settlement was not reached until later with Brookhaven is of no moment either. But all three were done without the knowledge or consent of Homeland. And that means that EQ Health is responsible for that decision, not Homeland. In addition, we talked a little bit about the indemnification exclusion. But I would like to touch on that here. We don't have a demand for indemnity anywhere, but that is what this case is about. There was an argument in reply that it really wasn't indemnification. It was contractual liability that was sought. But actually, if you look at the December 2019 tender from EQ Health, in there, Liz Wilson, who wrote the letter, was Chief of Staff for EQ Health, specifically references, here's the timeline giving rise to the claim for indemnity under the provisions of the EQ Health AHCA contract. In addition, we had, she attached there, an email from counsel for AHCA saying, you should expect an indemnification letter from us shortly. It's always been an indemnification dispute. So this contractual, it wasn't indemnity, it's contractual liability, even though that's first raised before this court, is of no moment. There really is no evidence of anything other than indemnity. You brought it up in your own brief, though. The policy has that sort of exclusion from an exclusion in 2J. So the exclusion J, I'm glad you brought that up. So exclusion K is the indemnity exclusion. Exclusion J is a completely separate exclusion that EQ Health uses to say, well, I fall within an exception to another exclusion, ergo, I must have coverage under the policy. Homeland has not relied on exclusion J. It's totally irrelevant to the analysis. And the case law is very clear that simply because you fall within an exception to one exclusion doesn't grant you coverage under the policy. And certainly you can have multiple exclusions where one applies and one doesn't. That's why you only look at exclusion K, but also an exception to another exclusion can't create coverage where none otherwise existed in the first place, which is our position here. You have to connect a few more dots to get there. Exactly. So for the indemnification, one of the arguments made on reply was that the provision wouldn't be triggered unless and until there was the liability for the indemnity determined under Malloy. That's a factually distinguishable case from what we have here. Of course, EQ Health actually admitted that it was liable and agreed to indemnify HCA. We don't have a situation where you have parties disputing the obligation of defense and indemnity under a contract in the first place. And the court says, when does that duty to defend become ripe? And in those types of MSA type case law, they say it doesn't become ripe until the end of the case because you have to determine actual liability in order to trigger the clause. That's not our situation here. There was no dispute. They assumed that obligation without reservation. And actually started, agreed to indemnify them and did so under the Brookhaven settlement. It's very clear on the terms on the settlement agreement itself that they're paying on behalf of HCA. That's the fulfillment of the condition of the settlement agreement that they made. So on top of that, I think there was an argument that... I'm sorry, Your Honor. The email between counsel also explicitly identifies indemnification so it's not a contract situation. I think there was also an argument that they were also seeking liquidated damages so that wouldn't fall within the scope of the indemnification exclusion. But then if you go back to the definition of damages, liquidated damages are excluded from that definition. So you can't look at the policy provisions in isolation. You have to look at them as a whole. And simply because one doesn't apply here doesn't mean that the other aspects of the policy aren't congruent. They are. And the situation here is to preclude a party from acting unilaterally or indemnifying someone where they wouldn't otherwise be liable. And indeed, EQ Health was not a party to these provider agreements and would have no obligation to pay for the provider agreements but for the indemnity agreement between it and HCA. So that's clearly why we rely on the indemnification exclusion here. We already spoke a little bit about the voluntary acts provision but within that framework is the related claim argument. The related claim argument obviously presumes that there are two claims here. Even the cases cited by EQ Health, in each of those cases there were two separate claims asserted that were the same. So you had a situation where one was denied because of late notice, another party comes along and says, I was, you know, the suit came against me, I'd like to relate back to the timely policy period for coverage. And the court said, no, those are related claims. But you actually had two claims. Here you never really had the claim against EQ Health for payment of the provider agreements. So that's why you don't get into the situation of a related claim in the first place. On top of that, the related claims provision cannot be used to impute a claim to another party where none has never been made. There's no case law to support that whatsoever that I have been able to find. In addition, the related claims provision can't be used to excuse an insured's conduct of admitting liability or assuming an obligation without the consent of the insurer. The case law is very clear that simply because an insurer denies one claim, for example, and then they go and admit liability on a completely separate claim, you can't then use the prior claim to relate back to it. You have to give the insurer the opportunity to review that claim, make a determination of coverage, and deny it before an insured can unilaterally go off on its own and settle a claim. I'm getting close to my time, so if the panel has any further questions, I'd be happy to hear them. Thank you, counsel. Otherwise, I'd ask this court to affirm the decision of the district court and uphold summary judgment in this case. Thank you. Okay. Ron, there's a couple of comments concerning Exclusions J and K. I forget which one it is, whether it's J or K, but when you read them together, you see that quite clearly they accept individual enrollee disputes from their purview. And what do we have here if it isn't an individual enrollee dispute? It's got to do with the gentleman who improperly received the treatment under the Medicaid statute. The reference to the Majalis case is interesting because in Majalis, claims made in reported policies were quite new, and they did not include a definition of the word claim in them, and so the court had to supply it. And that's not what we have here. We have a specific definition of the word claim in the policy. Now, I also heard that a claim has to be asserted in order to be a claim. Nothing in the definition of the word claim says it has to be asserted. You must assert it if you want... You must report it to the insurer if you want coverage, but that does not change its nature as a claim. Um... Judge Higginson, you seem to have been troubled by the monetary amount. I'd like to clear that up for you, if I could. There were two letters that my client received. The first one was on May 29, after there was a telephone discussion between my folks. And I'd like to quote what Mr. Clyde Higgs said in that letter. This is a letter from whom to whom? I'm sorry? A letter from whom to whom? From Homeland to EQ Hill. And it says, in accordance with Section 7, subsection B, we, meaning Homeland, will handle this matter as notice of an act, error or omission, that could give rise to a claim in the future. We will handle this matter as notice of an act... They admitted that they had an act, error or omission which could trigger coverage later. And what do the adjuster's notes concerning that conversation say? In, I believe it's... My brief says it's page 1289 of the record. It refers to a chronology that my client submitted to Homeland. And the entry for that chronology that was basically cut and pasted by the adjuster into his file notes says the following. 3-18-19. ACCA, the agency, for instance, Erica, contacted Vicky Duckworth, who was one of my client's employees. Ask EQ Health Solutions to pay the bill. Then there's a parenthetical comment. Our insurer says they never saw the actual billing and advises it's just more of a generic request to be financially responsible for the treatment of the patient. When you've got this kind of notice and you've got this admission on the part of Homeland that they have a notice of an act, error or omission that references the financial aspects of this matter, you have got a case for saying that the demand is for financial responsibility for the treatment of the patient, as the file notes say. File notes. All right. Well, I guess I'm still wondering if the insurance company says, You've got exposure. You certainly put us on notice. Just tell us if anyone really ever wants a demand from you. And when did EQ Health turn around and say, We've got the demand. Here we are on the hook. Well, they did it. They did it on June 17, and the denial came back. There's no claim. This is only a potential claim, even though there was a lawsuit threatened against the agency and demands were made against my client. Yep. I think we have that argument. Thank you, Your Honor. Appreciate your time. Okay. Well argued. And that concludes the case.